Good morning, Your Honor. My name is Gail Loon. May it please the court? Good morning, Mr. Wallet. I represent Steven Castello, firefighter and paramedic for the City of Seattle. This court has never given employers carte blanche to retaliate against employees whose conduct is not reasonably threatened to disrupt operations. Pickering imposes a balancing test requiring this court to weigh efficiency concern against the employees legitimate interest in speech and speaking on a matter of public concern. An employer must do more than simply raise the specter that there could be disruption in operations. And because employees have the constitutional right to speak on matters of public concern without fear of retaliation, this court should find on the district court record that paramedic Castello's private speech was protected, that the fire department had no reasonable belief that operations were or would be disrupted, and the district court's grant of summary judgment should be reversed, in this case remanded. The district court erred in in one primary and fundamental way. This was a motion for summary judgment. On summary judgment, the facts are to be taken in the light most favorable to the non-moving party. It's axiomatic. We just accept that every time we step before the court. In this case, the district court judge instead weighed the evidence and weighed the evidence in ways that were adverse to Castello and in favor of the police department or fire department. The fire department, in fact, produced no evidence of disruption or a threat of disruption. Well, the facts are to be reasonable inferences are to be drawn in the plaintiff's favor, but the court under the Pickering test still has to engage in that balancing. Now, the Supreme Court has said that substantial weight is given to the employer's reasonable prediction of disruption. So why was the court's weighing of the Pickering test unreasonable in this case? The district court's weighing was unreasonable, Judge Nguyen, because in order to come to the legal conclusion that Pickering allows the court to come to, she had to resolve the underlying factual issues. Those underlying factual issues were, and she accepted as true, that Chief Gregory Dean ordered Castello to cease soliciting responses to the survey. At the time of that alleged order, which even the city has accepted in its brief might have been, quote, misunderstood or misapprehended by Castello. I think that's a fair assumption on the record for us, that, in fact, there was no order given. The order, if you look at it carefully, says stop soliciting responses, and that's the language used everywhere in Chief Dean's declaration and everywhere in the record. He had not yet solicited a response to the survey. The survey was sent out on his private time in concert with nine other firefighters, clearly on matters of public concern. I'm not sure about that, Nguyen-Khanh, I mean, we had a case that was somewhat similar to this Doe versus City of San Francisco, where it didn't really relate to anything that would, say, be of interest to the public, necessarily. But it was arguably, the question in that case was the police officer didn't think that the prosecutions were being properly handled, and communicated about that, and we said, well, that's not a public concern. Your Honor, this case is more like McKinley. In McKinley, there were allegations by his employer, his public employer, that, in fact, he was simply speaking about his compensation. This court found that in speaking on matters relating to compensation, that was a genuine matter of public concern, because it affected the department's, the police department in that case, it affected the department's ability to attract and, that's the word I'm looking for, attract and retain qualified officers. Well, does the record reflect what your client was going to do with the survey? Yes, and, in fact, that was in the cover letter of the survey. I mean, and that's what I'm saying, one must look exclusively at the content, or not exclusively, but primarily at the content of the speech. The cover letter that accompanied the survey, went with every single survey, said, we are concerned, we are concerned that we are losing paramedics, and it is our duty to try and figure out why, basically, and we're going to provide that feedback to interested stakeholders. Yeah, it didn't say the public, it just said management and other stakeholders, right? And just because he wasn't planning to go to the press, does not remove his claim from First Amendment protection. But, you know, I could understand that if you had the results of the survey, and they were informative of the question, or critical of the department in explaining why officers are leaving, that clearly has speech implications to it. But I'm not sure, do we even have speech when we're asking, we have a survey? What information are we imparting to the public by asking questions of our colleagues? Judge Deary, I think you come to a very critical question, and that is, how does one get that information in the first instance? This was identified in the cover letter as the first of several steps that were anticipated. One was to get the concerns or collection of information from other paramedics who were freely and willing and able to give that information. In fact, sometimes public employees are better situated, this court has held, to know what's wrong within their own departments. Paramedic Castello made no pretense of the fact that, indeed, he believed that there was an issue with losing paramedics, that concern was shared with others in the department. When he spoke as a private citizen in sending out that survey, his speech was intended to collect the very information that you're asking, what's going to happen to it next? If nobody responds to the survey, then nothing happens. But ultimately, the fire department has claimed, after the fact, that he wasn't chastised for mailing out the survey in the first instance, although that allegedly gave rise to this order. If you'll look at the timeline, the timeline's very clear. All of these things happen, just boom, boom, boom. And then all of a sudden, he's transferred because, allegedly, he failed to follow an order. That, whether an order was given, back to Judge Wynn's question, whether that order was given is a question of fact. And if they're going to rely on resolving that factual dispute simply because Chief Dean said he said it, after the fact. But going back to my question, you would agree that no information was imparted to the public by virtue of the release of that survey. The general nature of the survey is calling for information, but the survey itself provides no information to the public. How is it a matter of public interest? It did provide some information, Judge Deary. The cover letter itself says we have concerns about losing qualified paramedics and retaining qualified paramedics. That is a matter of public concern. And your position is that the very nature of that stated concern makes it a matter of public interest. And the fact that it was, in fact, circulated to approximately 80 paramedics. Those paramedics at their homes are also members of the public. One doesn't have to go to the media and scream from the mountaintop that there's a problem. If you're trying to get information and you intend to do something with it or would have intended to do something with it, and you exercise your right of free speech to try and get that information and share with others that you think there's a problem, that is protected speech. That's speech on a matter of public concern. Well, I think the difference is, and I take your point, but let's say Doe, for example. There was speech that was communicated and here there was no speech that was communicated, at least up the chain, about saying here are the problems. It was gathering information to form the basis of future speech. In Doe, Your Honor, if I recall correctly, Doe was also discharging the duties of his office. In this case, paramedics. No, not really. He was a police officer. He was trying to tell the prosecutor how to prosecute cases. So, I mean, the prosecutor didn't think he was discharging the duties of his office. That's why they took umbrage with him. Well, in this case, Your Honor, it looks far much. The road was too far, too. I saw it in that case. I think this case is much more like Ulrich. And before I go any further, I would like to reserve five minutes. So I'm running short of time here. But the issue here is that paramedic Castello, in acting as a private citizen and raising these concerns with others, does not lose his privilege simply because he had a restricted audience. Ulrich versus City and County of San Francisco very clearly states that. And there's an entire line of cases that still provides protection regardless of whether his concerns were broadcast to a narrow audience and even to an internal audience. Could you speak briefly about the sanction? How was he retaliated? He was transferred for about three months without any loss of privileges or salary or anything of that sort. That's sort of the point of this timeline, Judge Deary. And that is to say that he was transferred. Every firefighter is a firefighter. But to be a paramedic firefighter, you go through additional training. You have to have additional skills. You have to maintain your certifications. Maintaining your certifications requires that you perform certain field skills, intubations, IV starts, those kinds of things. By removing him from the paramedic program for four months out of his scheduled 12-month year, he found himself behind the eight ball in terms of trying to get recertification. The other issue here is that. But that problem was addressed, wasn't it? Wasn't there a change affected that would allow him to attend these classes and so forth? He was never allowed to attend the classes, Judge Deary. He was offered an accommodation in the operating room to fulfill his field exercises, his field skills. But ultimately, the issue here is that he was transferred on November 26th. He sat in an engine company trying to explain to his peers why, in fact, he'd been transferred. Well, doesn't the fact that all of these events occurred within a very short period of time cut substantially against your case? You've got a situation where a letter was sent out in, I believe it was sometime in August, a letter was sent out. You've got an employee who complained to the chief that she felt targeted. You have the chief sitting down with him and talking to him and saying, look, we feel that that complaint is justified. And then within a very short period of time, he sends out this survey. The same employee then says, look, when I got this survey, which echoes the exact same first sentence of that letter, I felt threatened. And so the chief temporarily transferred him pending an investigation. That seems like a fairly reasonable reaction to me. I know that when he sat down with the chief, there was a dispute as to exactly what was said. But I don't believe there's any dispute that that meeting was about the survey and the complaint that the chief received. Or am I incorrect in that assumption? We don't dispute the nature of the conversation, Your Honor. What we are saying, however, is that what the fire department has demonstrated is that it can act quickly when it wants to. But it left him languishing in Judge Deary's, to answer Judge Deary's question, for four months. And the investigation consisted of one interview, and that was of paramedic Castello. Based on that, and what they already had on November 10th, and then subsequent to that, November 22nd, he was sent out. And then he was never disciplined. There was no validity to that complaint. But your point about that short time frame is they did absolutely nothing from the time that they received paramedic Simmons' complaint about the survey until he was transferred. They had over three weeks of time to do something, and they conducted no investigation, and they didn't do what they needed to do in terms of their due diligence to transfer him. The other issue that needs to be raised is that you bring in this prior discipline. That was a new argument in terms of my client's motivation on appeal. And there is a motion to strike, and I don't know if you'd like me to take any additional time to respond to that. But the issue here is that when paramedic Castello met with him, that discipline was not final. All he had was the intent that they were going to send him up for an OR, which is the lowest level of discipline available. That didn't bother him. The survey had been underway in its formative stages since late September or early October. And paramedic Castello was only one of several. He never heard anything about not sending out the survey. He didn't violate any policies. He didn't violate any CBAs. He didn't violate anything in sending out that survey on his personal time. After that first complaint came in from a paramedic who was not even working as a paramedic. She had voluntarily transferred herself to an engine company. So he wasn't working with her. There's no threat of disruption there. There was no basis to give him an order to cease soliciting responses when he hadn't solicited any responses. It had just been mailed. At that point in time, everything that follows that you've outlined is pretext. They show that they can move fast when they want to. And then they leave him sitting there for four months doing nothing in the way of an investigation. That's the retaliation that was taken. And it was based on the fact that he was engaged in the survey activity on matters of public concern. Is there anything in the record that might explain to us why he, despite the Taylor finding of insubordination and the recommendation of sanction, there was no discipline? You'd have to ask the fire department, Your Honor. So there's nothing in the record? I believe nothing in this record. There is in the district court record in terms of, not in the district court record even, it would be in Chief Dean's deposition transcript. So if you'd like me to tell you what he said, I can do that. But it isn't in the record. Okay. Thank you. And we'll give you a little bit of time for that. Thank you, Your Honor. Lawyer from the city. Good morning, Your Honors. My name is Fritz Wall, Assistant City Attorney representing the City of Seattle Fire Department. To go directly to Judge Deary's question on what's in the record, SER 250, Your Honor, Chief Dean sends an email to Steve Castello, explaining briefly that he's not going to discipline him and provides a brief explanation, that is the only explanation that is in the record. This case is Connick v. Myers, not in a district attorney's office, but in a fire department. The business of this employer is saving lives in emergency responses. The court has to take that into account in determining whether or not the needs of the employer outweigh the employee's limited right to speech. Here we have the specific context of a professional fire department. People's lives depend on the harmonious teamwork of paramedics who respond as partners in emergencies. Speech that has the potential to disrupt that teamwork must be balanced against the employer's need to protect the public. Actual disruption... Can I stop you right there? Is that the precise standard, speech that has the potential to disrupt, or must you have evidence of disruption? You do not have to have evidence of disruption. We do have evidence of disruption in this case, but you don't have to have evidence of disruption. I think Churchill v. Waters and Connick both point out that if a decision maker, an employer, has a reasonable basis to believe that speech is going to engage in disruption, then the employer has the right to restrain that speech. What is the evidence of disruption, if I may ask? Sure. There are a number of facts that support the summary judgment motion granting here and the evidence of disruption. First of all, you start with the survey itself. This is an unprecedented six-page survey with a large number of questions sent to 70 paramedics in their homes by mail. Whether they wanted to get them or not, they got them. And it raised issues regarding management, morale, and behavior of other paramedics. That's the first fact. The second fact, the survey was sent to Mitzi Simmons, even though she wasn't working as a paramedic at the time. She was on some reassignment somewhere else, which is a point they make in their appeal papers. The cover page stated that it was a preliminary survey, that a committee was going to be formed to review the responses, and that recommendations would be made to management for improvements. Castello intended to keep this survey going for a long period of time. So whatever disruption was caused by that survey, the fire chief, if he didn't act, could anticipate reasonably that the fallout from the survey was going to be substantial over a period of time. I can understand the level of discomfort among the management people. Here we have the troops discussing what's wrong with the operation. But disruption, that's why I ask you the question, what is disruption? And if there are facts in dispute on that particular question, this is summary judgment. And don't we provide the jury with the opportunity of deciding whether or not there was disruption by whatever definition we settle on? Not when there are undisputed material facts, as there are here, Your Honor, upon which search. If I may interrupt you for a second along the same line, so far you've just talked about the potential for disruption. You said the survey was sent, you said it was sent to Mitzi, you said that it was anticipated to go a long time. I guess I'm interested in actual disruption as opposed to perceived disruption. Okay. Well, there were complaints from paramedics who received the survey. A complaint was made by paramedic Mitzi Simmons, who had previously been found to have been the victim of targeting by Mr. Castello. The record is clear on... So you got Simmons and Shea, right? We got Simmons and Shea. And who else? Those are the two paramedics who complained about the survey. And if you look at ER 54-56, which sets out Marina Shea's deposition testimony, you'll find that there's very real evidence of disruption that she told Fire Chief Dean about when she called him to tell him about the survey. She told him that this survey is the kind of thing that causes division in a paramedic unit. She told him that it should not have been presented in this way, because that isn't how we do things down here, and that other people were upset. And then a few days later, after Chief Dean met with Mr. Castello to discuss the survey, and expressed at least his displeasure about the survey, then we know as another undisputed fact that caused disruption, that Mr. Castello brought that survey into the working facility of the fire department by putting a sign on his locker, in large letters for all paramedics to see, that said, please consider doing the SM-1 survey. That is further evidence of disruption, which immediately was brought to Chief Dean's attention by Paramedic Shea at SCR-236. But aside from what the testimony is from Simmons and Shea, what do we have? I mean, again, actual disruption, not as you've characterized it, actions that might cause disruption. I mean, we don't know whether they're putting on the locker caused disruption except, I think, Shea and Simmons, and maybe that's enough, but do you have anything else? I guess I don't have anything else by way of actual complaints, if that's what you're looking for. Judge Peckman, in her decision, of course, noted that two complaints is sufficient, and cited the case as the same, and an employer does not have to wait for more disruption. And, of course, there's no evidence, correct me please, of any operational difficulties that followed as a result of this solicitation. That is correct. There is no evidence of operational difficulties, and again, the fire chief did not have to wait for that evidence to act, particularly not in a fire department in a paramedic unit, given what they do. You talked about Connick. You know, the difference between the survey on Connick and this survey is that the Connick survey talked about rumor mills, it was pretty focused on morale and, for example, were you transferred, should have been transferred, and so forth. This survey is a little more generic in terms of quality, and I think it's a summary judgment state. Well, it's a question of law, I guess, but it seems to me that this is different from Connick in that sense. Do you agree or disagree? It has some differences from Connick. On the other hand, in some ways it's more invasive, because it was sent to every single paramedic, and its questions are far-reaching and basically deal with issues of job satisfaction, internal employee disputes, and things of that sort, which are not particularly high-level speech in terms of whether or not they're entitled to be protected. No, but there are a number of questions on quality and performance and whether or not initiatives have been fulfilled and so forth, which are a little different from the so-called rumor mill. In fact, the literal rumor mill, that was the question at Connick. Of course, there was more in the Connick survey than just rumor mill. They asked, are you satisfied, do you like your supervisors, that sort of thing. So there's the same kinds of questions. I mean, the bottom line here for me, and I think for Judge Peckman, is that the survey was something that was designed to express the speaker's displeasure with management, and basically to gather information for another round of controversy with management. That's what Connick says, and I think that rationale applies equally here. Well, she thought it was at least a matter of public concern that it was protected speech, though, contrary to your position. She did apply. She did find some protected speech. We don't argue with that finding. And I gather you concede that the transfer was an adverse employment action, right? The temporary removal of Mr. Castello, we don't, you're right, we don't disagree with you on that. So, I mean, although one may say it doesn't appear like there's a lot of harm, that's a question of damage, not a question of meeting the elements of retaliation, right? Right. I mean, we're basically here talking about balancing. Yes. And material issues of undisputed facts. With regard to the balancing, there's a dispute as to what was said when Mr. Castello met with the chief in November. Does the factual disputes create a material issue of facts such that summary judgment would be precluded? Because Mr. Castello may have to draw inferences in his favor, saying that he walked out of that meeting with no understanding that he was not to solicit a response to the survey. Now, there was a complaint, and he was aware of that, that Ms. Simmons was unhappy receiving the survey at her home. His subsequent action involved putting up, I believe, a sign on the locker, encouraging people to then respond to the survey. Why isn't that a sufficient factual dispute precluding summary judgment? Well, Judge Peckman did not rely on that so-called order or did not resolve that dispute as to whether or not he was ordered or not in her decision. It is not a necessary, it is not a fact upon which the summary judgment order is based, and it doesn't have to be resolved in order for this court to affirm. What we know is that we know from the testimony of both sides, Dean and Castello, that there was a conversation regarding the survey. We know that Dean expressed, as Castello admitted, displeasure about the survey. Dean says he ordered him and sent out a letter later saying that he ordered him. Castello disagrees. But what we do have is continued efforts by Mr. Castello to market his survey in the workplace with a posting of the sign and also conversations with other paramedics trying to get them to fill out the survey. That's evidence of disruption. And that Chief Dean, when he heard about that, he went ahead and temporarily removed Mr. Castello and put him in another firehouse outside the fire station. But the answer to your question is the conflict over whether he was ordered or not is not germane to the summary judgment motion. Judge Peckman didn't rely on it. We don't rely upon it here. There were other avenues available to Mr. Castello to express his concerns, and that could have been done in a non-disruptive fashion. He could have used the procedures that the fire department made available to all firefighters to express those kinds of concerns. In Garcetti v. Sabalos, a 2006 Supreme Court decision, the court held that an employer concerned about employees bringing issues to the attention of the employer in a disruptive manner has the option of instituting internal procedures that are receptive to employee criticism. The fire department has such a process in place. It's called a collective bargaining agreement. A collective bargaining relationship between the firefighters' union and the fire department provides employees with an avenue to let their bargaining representative and ultimately the employer know of their concerns. I mean, it's some irony, but if the union had sent out this survey, it would be perfectly acceptable, right? I would imagine that's probably true. And no less disruptive? I wouldn't say that. There was a reaction to a very negative reaction from paramedics who do not care for Steve Castello one bit. They don't have the same feelings of animosity towards their union because they haven't been treated by the union as they've been treated by Mr. Castello. Where is that in the record? Well, we know that there's reaction, negative reaction from the paramedics. Limited negative reaction by two people, one of whom had some sort of a history with Mr. Castello. Right, but the point is there's no evidence that there would have been a negative reaction  Right, I mean, I guess that's the question about whether or not the survey itself is disruptive in and of itself. And I think, you know, I mean, if the union has sent it out, I just don't see the disruption. Well, I think you're probably right, but the point is that this is the union's role. The union meets with its members every month. They can ask the union, the members, whatever they want. And this is a splendid opportunity if somebody's really interested in resolving a problem to use a non-disruptive way to address that problem. And that's available to Mr. Castello. He ignored it. Instead, he sent out the survey knowing that it was going to cause at least unrest, if not more. Or if there had been no union and he sent it out in an organizing attempt, perfectly acceptable, right? Perhaps that's a more complicated question of public employee bargaining that I might want to deal with, but it's certainly possible. It could be considered activity. You're right. The balancing analysis here should consider the limited value of the speech. This speech has low value. It does not report government malfeasance, graft, waste, safety concerns, or discrimination. The low public concern means that the government's burden to justify restricting it is lessened accordingly. To paraphrase Connick, the limited First Amendment interest here does not require the fire chief to tolerate action that he reasonably believed would disturb the office, undermine his authority, and destroy working relationships. Finally, the balancing must take into account the fire department's need to regulate speech to protect public safety. Medical responses in firefighting require teamwork and trust. There is no room among first responders for friction, hard feelings, or doubts about the integrity of the members of the team. All very valid, but just to make sure, there's nothing in this record that evidences a breakdown in teamwork, a failure to perform, a wholesale lack of morale, or anything of that sort. Those are the stated concerns which we appreciate, but there's no evidence that it had that impact. There's no evidence that it interrupted the response of anybody to an emergency situation, Your Honor. That is correct. The chief acted before that was going to happen. We're left with this sort of Churchill notion that employers subject in belief of disruptions enough if there's reasonable support in the record. That's correct. That's tough on summary judgment in a sense, but that's where we are. I think the Supreme Court in Churchill v. Waters has given the court a roadmap to allow employers to make those judgments and to uphold them as summary judgment, where you've got evidence here that what the employer did was very reasonable. It didn't fire Mr. Castello. He wasn't treated like Myers in the Connick case. He was reassigned for a period of time until things cooled off. That's a perfectly legitimate and good thing for a fire chief to do. But you concede that that was an adverse employment action. I haven't argued that it's not an adverse employment action. I simply said it's a very soft touch by the fire chief to resolve a situation, let it cool off, then do an investigation, then let him come back. That was a perfectly reasonable thing and constitutional thing for the fire chief to do. Thank you for your argument. We'll hear rebuttal. Why don't you put a minute and a half on? Thank you, Honor. Let me just start by saying that McKinley stands very clearly for the proposition that the close working relationship exception to Pickering cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views. Does the fact that Mr. Castello went outside of the union process reasonably play into the employer's judgment that this was divisive or potentially would cause disruption in the workplace? Thank you for your question, Judge Winn. I was planning to address that. It actually is a situation where Paramedic Castello did not go outside of regularly established union channels. He involved his shop steward, Scott Halfridge. That's in the record.  Paramedic Castello had every right to rely upon that representation from his union representative in order to do that. The other thing that is completely absent from the record, other than the assertion by Chief Dean in his declaration that this is somehow not proper or not square with the union, is that there is nothing in the CBA that's been submitted in the record. There's nothing from any union representative that said this isn't a proper way to behave or a proper course to follow. So to that extent, I think the fact that the union didn't do the survey, I think that Judge Thomas actually has the proper perspective on that. What mattered to Chief Dean was that Castello sent this survey. And it's that kind of personal retaliation for his right of free speech and his fear of what might happen down the road, which is unsubstantiated, and resulted in absolutely no disruption. But it wasn't Castello sending it out on behalf of the union after a meeting and discussion and agreement that, hey, there's some issues here, let's see what people think about management's response. It wasn't that situation. It was a Castello-directed survey sent out to employees' homes, and the survey results would be returned back to Mr. Castello. As a matter of fact, in the record that should be taken in his favor, he was one of ten people who prepared that survey. He might have been one of the leads, but there were ten people involved in that survey. He consulted with Scott Helfrich, not the union proper. You're correct. But one of his intended audiences after the fact, if you look at his deposition testimony, was the union. Depending on what the results were, if there was action that the union could take in a collective bargaining context, that was one of the places he intended to send this information and these recommendations. I assume that they were one of the stakeholders to which he referred in the cover letter. Yes, sir. So to that extent, the harmonious teamwork and basically the fact that there might be some disruption in the future based on their need to work closely together, there's absolutely no evidence that any paramedic complained about this survey other than Mitzi Simmons, who, as we've indicated, wasn't there. And Marina Shea actually testified that despite her concerns, she wasn't complaining, per se, and she wasn't complaining about Castello. She testified that after the fact and after Chief Dean told her to call HR and report this, she felt duped. She had no intention that it was ever going to go beyond her expression of concern to the chief and simply to say that, you know, this isn't how we do things, maybe we should start over, but there were good ideas in that survey and Castello had the right idea. That was her deposition testimony. All right. Thank you, Counsel. Thank you. I know our time has cut you off a little bit, but both briefs have been very good, and we appreciate your arguments this morning. The case of Castello v. City of Seattle will be submitted for decision.
judges: Dearie, Thomas, Nguyen